**No. 26-10018**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

Antonio Torres,
*Plaintiff - Appellant*

v.

Jeremiah Cecil Byous,
*Defendant - Appellee*

---

On Appeal from

United States District Court for the Northern District of Texas

3:23-CV-2765

---

# BRIEF OF APPELLANT ANTONIO TORRES

---

Submitted By:

Damon E. Mathias
Mathias Raphael, P.L.L.C.
13101 Preston Road, Suite 501
Dallas, TX 75240
**Attorney for Appellant**

**No. 26-10018**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

Antonio Torres,
*Plaintiff - Appellant*

v.

Jeremiah Cecil Byous,
*Defendant - Appellee*

---

## CERTIFICATE OF INTERESTED PERSONS

*The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.*

| **Appellee:** | **Counsel for Appellees:** |
|---|---|
| Jeremiah Byous | Kevin Curley of Messer Fort, P.L.L.C. Frisco, TX |
| | Melissa Cranford of Messer Fort, P.L.L.C. Frisco, TX |

| **Appellant:** | **Counsel for Appellants:** |
|---|---|
| Antonio Torres | Damon Mathias of Mathias Raphael, P.L.L.C. Dallas, TX |
| | Ori Raphael of Mathias Raphael, P.L.L.C. Dallas, TX |

/S/Damon E. Mathias
Attorney of record for
Antonio Torres

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument under Fed. R. App. P. 34(a) and 5th Cir. R. 28.2.3. Argument would significantly aid the decisional process. *First*, this appeal squarely presents a textualist challenge to qualified immunity grounded in the "Notwithstanding Clause" of the Civil Rights Act of 1871 — an issue a member of this Court has identified as warranting reconsideration but that no court of appeals has resolved on the merits. *See Rogers v. Jarrett*, 63 F.4th 971, 982–83 (5th Cir. 2023) (Willett, J., concurring). *Second*, the clearly-established-law issue presents an unresolved tension between *Hope v. Pelzer*, 536 U.S. 730 (2002), and *Mullenix v. Luna*, 577 U.S. 7 (2015), on a record that includes body-worn-camera footage and a sustained Internal Affairs finding. The panel's questioning of counsel on these points would materially aid the decision.

# TABLE OF CONTENTS

Contents Page(s)

**JURISDICTIONAL STATEMENT** .......... **5**
**STATEMENT OF THE ISSUES** .......... **6**
**STATEMENT OF THE CASE** .......... **7**
A. Nature of the Case .......... 7
B. Statement of Facts .......... 8
1. The encounter .......... 8
2. Officer Byous's contemporaneous statements .......... 9
3. Mr. Torres's injuries .......... 10
4. The Department's adjudication .......... 10
C. Procedural History .......... 11
D. Rulings Presented for Review .......... 12
**SUMMARY OF THE ARGUMENT** .......... **13**
**ARGUMENT** .......... **19**
**I. QUALIFIED IMMUNITY AS APPLIED IN THIS CASE AND THROUGHOUT THE FIFTH CIRCUIT IS IRRECONCILABLE WITH THE TEXT OF 42 U.S.C. § 1983 AS CONGRESS ORIGINALLY ENACTED IT** .......... **19**
A. Standard of Review .......... 19
B. The Enrolled Text of § 1983 Controls — and It Has Never Been Interpreted by Any Court .......... 19
C. The Enrolled Text of Section 1 of the Civil Rights Act of 1871 Contains the Notwithstanding Clause .......... 22
D. The 1874 Codification Did Not — and Could Not — Repeal the Notwithstanding Clause .......... 24
E. The Court Has Been Construing a Phantom Statute: Pierson v. Ray and Its Progeny .......... 25
F. The Supreme Court's Own Textualist Methodology Compels Correction .......... 27
G. Stare Decisis Does Not Protect a Doctrine Built on a Statute Congress Never Enacted .......... 29
H. Purposivism Confirms the Same Conclusion .......... 32
I. This Court Should Acknowledge the Foundational Error and Call for

Supreme Court Correction ....................34
J. Conclusion ....................35
**II. THE DISTRICT COURT ERRED IN GRANTING QUALIFIED IMMUNITY BECAUSE TWO INDEPENDENT PATHWAYS GAVE OFFICER BYOUS FAIR WARNING ....................36**
A. Introduction ....................36
B. Standard of Review ....................37
C. The District Court Applied a Standard of Factual Specificity That Hope v. Pelzer Expressly Forbids ....................37
D. Pathway A: Fifth Circuit Precedent and a Multi-Circuit Consensus Gave Officer Byous Fair Warning ....................40
E. Pathway B: Officer Byous Violated the Constitutional Force Continuum ....................48
F. Conclusion ....................54
**CONCLUSION ....................54**
**CERTIFICATE OF SERVICE ....................57**
**CERTIFICATE OF COMPLIANCE ....................58**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Sangamon County*, 705 F.3d 706 (7th Cir. 2013) ..................16, 45, 47

*Anderson v. Creighton*, 483 U.S. 635 (1987) ..................................................26

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)....................................................46, 48

*Bagley v. Guillen*, 90 F.4th 799 (5th Cir. 2024)............12, 16, 17, 36, 43, 44, 54

*Baker v. City of Hamilton*, 471 F.3d 601 (6th Cir. 2006)............................16, 47

*Baxter v. Bracey*, 140 S. Ct. 1862 (2020).........................................................29

*Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016) ........................................16, 47

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)........................................15, 27

*Briscoe v. LaHue*, 460 U.S. 325 (1983) ...........................................................26

*Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010).............................................19

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) .........................................22

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) .........................................28

*Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016)..................................12, 16, 42

*Curran v. Aleshire*, 800 F.3d 656 (5th Cir. 2015) ....12, 16, 17, 36, 37, 40, 41, 44

*Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) ......................16, 43

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) .....30, 32

*Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957)................24

*Gamble v. United States*, 587 U.S. 678 (2019) .................................................32

*Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016) ...............................................19

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496 (1939) ....................................25

*Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017).........................16, 19, 37, 43, 52

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)..........................................14, 26, 34

*Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) .....................................................29

*Hope v. Pelzer*, 536 U.S. 730 (2002)6, 13, 15, 17, 30, 36, 37, 38, 40, 44, 46, 48, 51, 52, 54, 55

*Imbler v. Pachtman*, 424 U.S. 409 (1976)..................................................14, 26

*INS v. Chadha*, 462 U.S. 919 (1983)....................................................14, 25

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).......................................27

*Johnson v. Jones*, 515 U.S. 304 (1995)...........................................................30

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) .........................................24

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020)..................................................47

*Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020)12, 16, 17, 37, 40, 42, 44

*Kimble v. Marvel Ent., LLC*, 576 U.S. 446 (2015).....................................29, 31

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)..................15, 29, 32

*Malley v. Briggs*, 475 U.S. 335 (1986).......................................6, 18, 48, 53, 55

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892).................................14, 22

*Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268 (5th Cir. 2015) ..42

*McCoy v. Alamu*, 141 S. Ct. 1364 (2021).........................................................39

*McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018)...........................................16

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ...................................................28

*Mitchum v. Foster*, 407 U.S. 225 (1972)...........................................................32

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).........................................27

*Monroe v. Pape*, 365 U.S. 167 (1961)...............................................................33

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019) .........................................46

*Mullenix v. Luna*, 577 U.S. 7 (2015) .............................14, 26, 28, 30, 31, 34, 36

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019) .....................................15, 28

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012) ................................12, 16, 41

*Ngiraingas v. Sanchez*, 495 U.S. 182 (1990) .....................................................27

*Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009) ......................52

*Pierson v. Ray*, 386 U.S. 547 (1967)6, 13, 14, 19, 20, 21, 25, 26, 27, 28, 30, 34, 35, 55

*Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012)....................16, 43, 54

*Ramos v. Louisiana*, 590 U.S. 83 (2020)...........................................................31

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023) .......... 14, 21

*Saucier v. Katz*, 533 U.S. 194 (2001) .......... 38

*Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017) .......... 16, 47

*Stephan v. United States*, 319 U.S. 423 (1943) .......... 24

*Strother v. Lucas*, 37 U.S. (12 Pet.) 410 (1838) .......... 14, 23

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) .......... 39

*Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021) .......... 9

*United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993) .......... 24

*United States v. Lanier*, 520 U.S. 259 (1997) .......... 38

*United States v. Price*, 383 U.S. 787 (1966) .......... 24

*United States v. Welden*, 377 U.S. 95 (1964) .......... 24

*Vardeman v. City of Houston*, 55 F.4th 1045 (5th Cir. 2022) .......... 12, 16, 17, 36, 44

*Wilson v. Garcia*, 471 U.S. 261 (1985) .......... 27

*Winzer v. Kaufman Cnty.*, 916 F.3d 464 (5th Cir. 2019) .......... 37

*Wood v. Strickland*, 420 U.S. 308 (1975) .......... 26

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) .......... 29

**Statutes, Rules, and Constitutional Provisions**

1 U.S.C. § 112 .......... 22

1 U.S.C. § 204(a) .......... 14, 22

28 U.S.C. § 1291 .......... 5

28 U.S.C. §§ 1331, 1343(a)(3) .......... 5

42 U.S.C. § 1983 .......... passim

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 .......... passim

Fed. R. App. P. 4(a)(1)(A) .......... 5

Fed. R. App. P. 4(a)(4)(A)(iv) .......... 5

Fed. R. Civ. P. 59(e) .......... 5, 13

U.S. Const. art. I, §§ 1, 7 .......... 25

**Other Authorities**

William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018)28

1 William Blackstone, *Commentaries on the Laws of England* (1765) .23, 35, 55

Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark. L. Rev. 741 (1987) ..................................33

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023) ..........................................................................................................21

Noah Webster, *An American Dictionary of the English Language* (1828)........23

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiff-Appellant Antonio Torres brought this action under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution. ROA.73-83 (First Am. Compl.).

This Court has appellate jurisdiction under 28 U.S.C. § 1291. On August 15, 2025, the district court entered a Memorandum Opinion and Order granting Defendant-Appellee Jeremiah Byous's motion for summary judgment and a Final Judgment dismissing all of Mr. Torres's claims with prejudice. ROA.290-298 (Mem. Op. & Order); ROA.299 (Final J.). The Final Judgment disposed of all claims of all parties.

The appeal is timely. On September 11, 2025 — within 28 days of the Final Judgment — Mr. Torres filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), which tolled the time to appeal under Federal Rule of Appellate Procedure 4(a)(4)(A)(iv). ROA.300-312 (Mot. for Recons.). The district court denied that motion on December 9, 2025. ROA.332-334 (Mem. Op. & Order). Mr. Torres filed his Notice of Appeal on January 6, 2026, ROA.335-336 (Notice of Appeal), well within the thirty-day appeal period prescribed by Federal

Rule of Appellate Procedure 4(a)(1)(A) as measured from the order denying his post-judgment motion.

## STATEMENT OF THE ISSUES

I. Whether the doctrine of qualified immunity can be reconciled with 42 U.S.C. § 1983 as Congress enrolled and the President signed it — specifically, the "Notwithstanding Clause" of Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, which provides that an officer who deprives a person of constitutional rights shall be liable "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding" — when those sixteen words were dropped from the 1874 codification on which *Pierson v. Ray*, 386 U.S. 547 (1967), and its progeny rest, and no court has ever interpreted that text in deciding whether Congress meant to displace common-law immunities.

II. Whether the district court erred in granting summary judgment on the clearly-established-law prong of qualified immunity — without reaching whether a constitutional violation occurred — where Officer Byous struck Mr. Torres twice in the head with metal handcuffs gripped in his fist at the moment Mr. Torres, cornered at a chain-link fence with hands raised, was lowering himself toward the ground; the Dallas Police Department's own defensive-tactics trainer concluded after frame-by-frame review of the body-worn-camera footage that the strikes were "not reasonable" and "did not fall within Departmental policy"; and Internal Affairs sustained an "Inappropriate or Unnecessary Use of Force" finding at every level of departmental review through the Chief of Police. The issue presents two independent, alternatively-sufficient grounds for reversal:

A. Whether the district court's case-by-case factual distinctions of a body of Fifth Circuit precedent — reinforced by a multi-circuit consensus — establishing that officers may not strike a non-resisting, surrendering suspect imposed a level of specificity that *Hope v. Pelzer*, 536 U.S. 730 (2002), expressly forbids; and

B. Whether *Hope*'s recognition that non-judicial sources — including departmental policies, training materials, and sustained internal disciplinary findings — can independently supply fair warning, combined with *Malley v. Briggs*, 475 U.S. 335 (1986)'s "plainly incompetent" standard, independently defeats qualified immunity on this record.

## STATEMENT OF THE CASE

### A. Nature of the Case

This is a 42 U.S.C. § 1983 excessive-force action arising from a body-worn-camera-recorded encounter on January 7, 2022, in which Dallas Police Officer Jeremiah Byous ("Byous" or "Officer Byous") tackled Antonio Torres ("Torres") against a residential chain-link fence and struck him twice in the head — with metal handcuffs Officer Byous was holding in his fist — at the moment Mr. Torres, his flight ended and his hands raised, was lowering himself toward the ground. The Dallas Police Department's own defensive-tactics trainer concluded that the strikes were not reasonable and were outside Departmental policy. Internal Affairs sustained a finding of "Inappropriate or Unnecessary Use of Force" at every level of departmental review — through the Chief of Police — and Officer Byous served a ten-day unpaid suspension.

Mr. Torres pleaded his § 1983 claim under "the original and correct version of the statute enacted by the United States Congress and containing the 'notwithstanding clause,'" expressly disclaiming reliance on the truncated codified

text, ROA.74 (First Am. Compl. ¶ 1.5); ROA.79 (id. ¶¶ 5.1–5.4), and alternatively alleged that the violation of his Fourth and Fourteenth Amendment rights was clearly established under existing precedent. ROA.79-80 (FAC ¶¶ 5.5–5.8). Without reaching whether a constitutional violation had occurred, the district court (Starr, J.) granted summary judgment to Officer Byous on the clearly-established-law prong of qualified immunity, dismissed all claims with prejudice, and denied reconsideration. ROA.290-298 (Mem. Op. & Order, Aug. 15, 2025); ROA.299 (Final J., Aug. 15, 2025); ROA.332-334 (Mem. Op. & Order, Dec. 9, 2025).

**B. Statement of Facts**

**1. The encounter.**

On the morning of January 7, 2022, Mr. Torres — a man in his twenties recently widowed — was driving a 2013 Dodge Ram 1500 that had been reported stolen earlier that day. ROA.75 (FAC ¶¶ 4.1–4.3); ROA.290 (Mem. Op. & Order). Officer Byous, on patrol in a residential Dallas neighborhood, attempted to stop the truck. ROA.75 (FAC ¶ 4.4); ROA.290-291 (Mem. Op. & Order). Mr. Torres did not comply: he stopped briefly, exited the vehicle, and fled on foot. ROA.75 (FAC ¶¶ 4.5–4.7); ROA.291 (Mem. Op. & Order).

The foot pursuit was brief. Mr. Torres ran into a neighbor's front yard, where his path was blocked by a chain-link fence. ROA.75 (FAC ¶ 4.8); ROA.291 (Mem. Op. & Order). Cornered, Mr. Torres turned to face Officer Byous and raised his

hands. ROA.75 (FAC ¶ 4.8); ROA.78 (FAC ¶ 4.19). The Dallas Police Department's own defensive-tactics expert, Sergeant Anthony Greer — Sergeant of the Department's Defensive Tactics, PT, and Less Lethal training program — reviewed the body-worn-camera footage frame-by-frame at the direction of Internal Affairs. ROA.223-224 (Doc. 40-3 at 1-2). He concluded:

> Although the subject did initially exhibit Defensive Resistance when he pulled away, ran from Officer Byous, and pulled over a trash can to obstruct Officer Byous, the subject's flight and Defensive Resistance stopped once he found himself unable to flee any further due to a fence . . . . [T]he Defensive Resistance level was not a continuation because the subject was no longer fleeing, and he appeared to be going down to the ground just prior to Officer Byous delivering the strikes . . . . [A]t the time the strikes were delivered no verbal commands or direction were given and the subject appeared to offer no resistance.
> ROA.223-224 (Doc. 40-3 at 1-2).

Officer Byous nonetheless tackled Mr. Torres and delivered two closed strikes to his head — still gripping a pair of metal handcuffs in his striking hand. The district court's own factual recitation, drawn from the body-worn-camera footage it viewed under *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021), put it this way: "Officer Byous tackled and struck Torres twice in the head with his hand. *Importantly, Officer Byous never released the handcuffs, and they were still in his hand when he struck Torres.* Torres was bleeding from the head and was arrested." ROA.291 (Mem. Op. & Order) (emphasis added).

**2. Officer Byous's contemporaneous statements.**

Officer Byous's body-worn camera recorded a series of contemporaneous statements after the strikes. He told fellow officers, "I laid into him cause I'm injured." ROA.76 (FAC ¶ 4.12). He chuckled to the responding emergency medical technician, "Oh, I got a hold of him." *Id.* And he told Mr. Torres he would "bury" him and "make sure [he] never get[s] out of jail." *Id.* The "assault on a public servant" charge Officer Byous filed against Mr. Torres was abandoned and not pursued. ROA.73 (FAC ¶ 1.3).

**3. Mr. Torres's injuries.**

Mr. Torres was transported to Baylor University Medical Center, where his head wounds required staples and stitches. ROA.78 (FAC ¶ 4.21). He has since experienced concussion-driven headaches, occipital neuralgia, mild cognitive impairment, and insomnia, corroborated by EEG and ERP testing, and remains under continuing care at Lone Star Neurology, including neurofeedback therapy and nerve-block treatments. *Id.*

**4. The Department's adjudication.**

The Dallas Police Department's own administrative process found Officer Byous's use of force unreasonable and outside policy. Sergeant Greer — the same officer responsible for training Department personnel on the constitutional force continuum — concluded after his frame-by-frame review that "the closed strikes to the head utilized by [O]fficer Byous were not reasonable and did not fall within

Departmental policy." ROA.224 (Doc. 40-3 at 2). Internal Affairs Investigation No. CN2022-054 sustained the allegation that Officer Byous committed "Inappropriate or Unnecessary Use of Force" in violation of DPD Code of Conduct § 4.10 and General Order 703.02(A)(4). ROA.247 (Doc. 40-7). The finding was sustained at every level of review — by Officer Byous's immediate supervisor, the Internal Affairs Division, the Public Integrity Unit, the Patrol Bureau, and ultimately Chief of Police Eddie Garcia. ROA.221-222 (Doc. 40-2 at 4-5); ROA.250-254 (Doc. 40-9). Assistant Chief Michael T. Igo issued a formal disciplinary letter, and Officer Byous served a ten-day unpaid suspension. ROA.251-254 (Doc. 40-9 at 2-5); ROA.77 (FAC ¶ 4.18).

**C. Procedural History**

Mr. Torres filed his Original Complaint on December 14, 2023. ROA.8 (Doc. 1). After receiving the body-worn-camera footage in discovery in March 2024, he filed a First Amended Complaint on April 23, 2024 — the operative pleading — which raised, in its first numbered paragraphs, his textual challenge to qualified immunity and re-pleaded his § 1983 claim under the original 1871 enrolled-bill text containing the Notwithstanding Clause. ROA.73-83 (FAC); ROA.74 (FAC ¶ 1.5); ROA.79 (FAC ¶¶ 5.1–5.4).

Officer Byous filed a notice of intent to move for summary judgment on qualified-immunity grounds, ROA.116-117 (Doc. 25), and on May 7, 2024, the

district court limited discovery to the qualified-immunity issue and administratively closed the case pending resolution of that question. ROA.102-104 (Doc. 21). The magistrate judge denied Mr. Torres's request for limited qualified-immunity discovery on March 6, 2025. ROA.181-188 (Doc. 39).

Officer Byous moved for summary judgment on September 3, 2024. ROA.135-160 (Docs. 32, 33, 34). Mr. Torres filed his response on March 27, 2025, supported by, among other exhibits, Sergeant Greer's internal statement, the Internal Affairs investigation file, and the disciplinary letter sustained through the Chief of Police. ROA.189-278 (Doc. 40 & exhibits). Briefing on the motion was completed on April 10, 2025. ROA.279-289 (Doc. 41).

**D. Rulings Presented for Review**

On August 15, 2025, the district court issued a Memorandum Opinion and Order granting summary judgment on the second prong of qualified immunity. ROA.290-298 (Mem. Op. & Order). The court did not reach whether Officer Byous's conduct violated the Fourth Amendment, ROA.292 ("the Court can resolve the motion solely on the second question"), and did not address Mr. Torres's textual challenge to qualified immunity. The court distinguished each of the six Fifth Circuit excessive-force decisions Mr. Torres relied on — *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020); *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016); *Bagley v. Guillen*, 90 F.4th 799 (5th Cir. 2024);

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012); *Vardeman v. City of Houston*, 55 F.4th 1045 (5th Cir. 2022); and *Curran v. Aleshire*, 800 F.3d 656 (5th Cir. 2015) — and concluded that Mr. Torres "fail[ed] the qualified immunity['s] specificity requirement" and that this was not the "rare case" of "obvious" unconstitutionality. ROA.293-298. The court entered Final Judgment dismissing all claims with prejudice the same day. ROA.299 (Final J.).

On September 11, 2025, Mr. Torres filed a timely motion for reconsideration under Federal Rule of Civil Procedure 59(e), arguing that the district court's case-by-case factual distinctions had imposed a level of factual specificity that *Hope v. Pelzer*, 536 U.S. 730 (2002), expressly forbids. ROA.300-312 (Mot. for Recons.). The district court denied the motion on December 9, 2025, stating that it "did not demand 'materially similar' facts, the approach Hope rejected." ROA.332-334 (Mem. Op. & Order). Mr. Torres filed his Notice of Appeal on January 6, 2026. ROA.335-336.

The rulings presented for review are: (1) the district court's August 15, 2025 Memorandum Opinion and Order, ROA.290-298, and the resulting Final Judgment, ROA.299; and (2) the district court's December 9, 2025 Memorandum Opinion and Order denying reconsideration, ROA.332-334.

## SUMMARY OF THE ARGUMENT

This appeal asks this Court to reverse a grant of qualified immunity that rests on either of two independent and independently-sufficient errors. Each, on its own, requires reversal.

***I. Qualified immunity is irreconcilable with the enrolled text of 42 U.S.C. § 1983.***

The Supreme Court announced qualified immunity in *Pierson v. Ray*, 386 U.S. 547 (1967), on the premise that the legislative record contained "no clear indication" that Congress meant to abrogate common-law immunities when it enacted § 1983. Id. at 554. That premise was wrong as a matter of historical fact. Congress provided exactly that signal in the very text of the statute. Section 1 of the Civil Rights Act of 1871 — the enrolled bill signed by President Grant and printed in the Statutes at Large — provided that any officer who deprives a person of constitutional rights "shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,* be liable to the party injured." 17 Stat. 13. Those sixteen italicized words — the Notwithstanding Clause — are missing from the codified version of § 1983 that Pierson construed and that this Court has applied for nearly six decades.

The omission has no legal force. A statute becomes law through bicameralism and presentment, not codification; the Reviser's clerical decision in 1874 to drop sixteen words has no constitutional power to repeal them. *INS v.*

*Chadha*, 462 U.S. 919, 951 (1983); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672–73 (1892); 1 U.S.C. § 204(a) (Code is only "prima facie" evidence of the law). The enrolled text controls, and on the question of state-law immunities — common-law immunities very much included, *see Strother v. Lucas*, 37 U.S. (12 Pet.) 410, 436–37 (1838) — that text is "unsubtle and categorical." *Rogers v. Jarrett*, 63 F.4th 971, 982 (5th Cir. 2023) (Willett, J., concurring).

The doctrinal consequences follow inexorably. Pierson and its progeny — *Wood*, *Imbler*, *Harlow, Anderson*, *Mullenix*, on through *Rivas-Villegas* and *City of Tahlequah* — were not interpreting any statute Congress enacted; they were construing an artifact of the 1874 codification. Statutory stare decisis offers no shelter to "a purely judge-made rule not grounded in anything Congress has enacted," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), and every textualist principle the Supreme Court has articulated demands that enrolled text prevail over judicial gloss. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020); *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). A doctrine that "brazenly contradicts" the words on the page is not statutory interpretation, *Rogers*, 63 F.4th at 983 (Willett, J., concurring); it is judicial legislation. This Court should hold that qualified immunity cannot survive contact with the Clause Congress wrote and reverse on that ground.

***II. Even under existing qualified-immunity doctrine, reversal is required.***

The district court granted summary judgment to Officer Byous on the second prong of qualified immunity — without reaching whether his conduct violated the Fourth Amendment — by treating a body of binding precedent as inapplicable on case-by-case factual gradations. That ruling cannot stand on either of two independent grounds.

A. The case-law pathway. The district court applied a level of factual specificity that *Hope v. Pelzer*, 536 U.S. 730 (2002), expressly forbids. *Hope* held that the "salient" fair-warning inquiry asks "whether the state of the law . . . gave [officials] fair warning that their alleged treatment was unconstitutional," *id.* at 741, and rejected any rule that precedent must be "materially similar" or "fundamentally similar," *id.* at 740–41. Well before January 7, 2022, this Court had repeatedly held — in *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), *Curran v. Aleshire*, 800 F.3d 656 (5th Cir. 2015), *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017), *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018), and *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020) — that an officer may not use force on a suspect who is complying with commands or whose resistance has ceased. *See Joseph*, 981 F.3d at 335 ("[f]orce must be reduced once a suspect has been subdued"). This Court has since reaffirmed that line in *Vardeman v. City of*

*Houston*, 55 F.4th 1045 (5th Cir. 2022), and *Bagley v. Guillen*, 90 F.4th 799 (5th Cir. 2024) — confirming that the rule was not novel in 2022 but a settled doctrinal principle. Officers must instead employ "measured and ascending actions" calibrated to the suspect's level of resistance. *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012); *see also Hanks v. Rogers*, 853 F.3d 738, 749 (5th Cir. 2017). Five other circuits have reached the same conclusion. *Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006); *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013); *Becker v. Elfreich*, 821 F.3d 920, 928–29 (7th Cir. 2016); *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018). The principle is concrete: "when [officers] physically strike a suspect who is not resisting arrest," they commit excessive force. *Joseph*, 981 F.3d at 342.

The district court worked around this body of law by distinguishing each case on its facts: *Bartlett* and *Cooper* involved more severe force; *Bagley*, *Newman*, and *Vardeman* involved suspects who had not initially fled; *Curran* did not involve a chase. None of those distinctions is constitutionally meaningful. If twenty strikes against a non-resisting suspect violate clearly established law, then so does one — the principle is the same; magnitude is a damages question. If an officer who slammed a juvenile's head into a wall was not entitled to qualified immunity in *Curran*, neither is one who struck a surrendering adult who had earlier

fled. *Hope*'s rule is precisely that constitutional principles "may apply with obvious clarity" outside their original factual context, 536 U.S. at 741, and the district court's case-by-case parsing reinstates the "materially similar" requirement *Hope* discarded.

B. The plainly-incompetent pathway. *Hope* also recognized that fair warning can come from non-judicial sources — there, an Alabama prison regulation and a Department of Justice report. 536 U.S. at 744–46. Here, the equivalent sources are present in stronger form. Virtually every American police agency translates *Graham v. Connor*'s objective-reasonableness factors into a "force continuum" that scales the level of permissible force to the level of suspect resistance, and the Dallas Police Department's Linear Response Continuum is the local instance of that universal model: closed-fist strikes to the head are categorically prohibited against passive resistance, reserved (if at all) for active aggression two full categories above. Officer Byous's own department's defensive-tactics trainer — Sergeant Anthony Greer, the officer responsible for training the Department on this very continuum — reviewed the body-worn-camera footage frame-by-frame at the direction of Internal Affairs and concluded that the strikes were "not reasonable" and "did not fall within Departmental policy." ROA.223-224 (Doc. 40-3 at 1–2). Internal Affairs sustained an "Inappropriate or Unnecessary Use of Force" finding

at every level of departmental review through the Chief of Police, and Officer Byous served a ten-day unpaid suspension. ROA.250-254 (Doc. 40-9).

The convergence of trained-force matrix, departmental adjudication, and judicial consensus forecloses any claim of reasonable mistake. Under *Malley v. Briggs*, 475 U.S. 335, 341 (1986), qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Officer Byous's conduct — accompanied by his contemporaneous statements that he "laid into [Mr. Torres] cause [he was] injured" and would "bury" him, ROA.76 (FAC ¶ 4.12) — falls into the latter category, not the former.

For these reasons, this Court should reverse the grant of summary judgment and remand for trial. Issue I requires that result on a foundational textual ground that no federal court of appeals has resolved on the merits. Issue II requires the same result under existing doctrine, on either of two alternatively-sufficient pathways. Each ground is independently sufficient.

# ARGUMENT

## I. QUALIFIED IMMUNITY, AS APPLIED IN THIS CASE AND THROUGHOUT THE FIFTH CIRCUIT, IS IRRECONCILABLE WITH THE TEXT OF 42 U.S.C. § 1983 AS CONGRESS ORIGINALLY ENACTED IT.

### A. Standard of Review.

"This court reviews de novo the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity." *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016). "Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. at 311–312. In conducting that review, this Court "view[s] the facts in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in [his] favor." *Hanks v. Rogers*, 853 F.3d 738, 743–44 (5th Cir. 2017). Generally, to overcome qualified immunity at summary judgment, the plaintiff bears the burden of "establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Hanks*, 853 F.3d at 744 (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

### B. The Enrolled Text of § 1983 Controls—and It Has Never Been Interpreted by Any Court.

For more than half a century, this Court and the Supreme Court have construed 42 U.S.C. § 1983 to permit a judge-made defense of qualified immunity. That doctrine rests, however, on a version of the statute that Congress

never enacted. When the Supreme Court announced qualified immunity in *Pierson v. Ray*, 386 U.S. 547 (1967), it interpreted § 1983 as printed in the Revised Statutes of 1874 and the United States Code. That text is missing sixteen words from the bill Congress passed and President Grant signed.The text Congress actually passed in 1871 said something materially different. It said that any officer who deprives a person of constitutional rights "shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured." Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (emphasis added). Those sixteen italicized words—the "Notwithstanding Clause"—were the very evidence the Supreme Court declared could not be located when it announced qualified immunity in *Pierson*. The Clause was there all along, in the enrolled bill signed by President Grant. It has been hiding in plain sight in the Statutes at Large for 155 years.

Appellant Antonio Torres pleaded this textual challenge in the very first paragraphs of his Original Complaint and re-pleaded it in his First Amended Complaint, expressly disclaiming reliance on the truncated codification and asserting his § 1983 claim under "the original and correct version of the statute enacted by the United States Congress and containing the 'notwithstanding clause.'" ROA.9 (Original Compl. ¶ 1.5); *see also* ROA.79 (First Am. Compl. ¶¶ 5.1–5.4) ("The original version, as enacted by the United States Congress, is the

law of the United States. The improper and inaccurate version of the law, printed and reprinted for over one hundred years, is expressly rejected as the source of Plaintiff's claims.").

The issue has been preserved at every stage. Under bedrock principles of statutory interpretation—the enrolled-bill doctrine, the rule that codification errors cannot rewrite enacted law, and the textualism that a unanimous Supreme Court professes—the Notwithstanding Clause is binding law that displaces every state-law immunity, common-law or otherwise. Qualified immunity, which derives entirely from common-law tradition, cannot survive contact with the Clause.

As Judge Willett of this Court has already concluded, the rediscovered text "is unsubtle and categorical," "explicitly displace[s] common-law defenses," and is "game-changing" for qualified-immunity doctrine. *Rogers v. Jarrett*, 63 F.4th 971, 982–83 (5th Cir. 2023) (Willett, J., concurring) (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023)).

The argument proceeds in six parts. *First*, the enrolled text of § 1 of the 1871 Act contains the Notwithstanding Clause and unambiguously abrogates state-law immunities (Part C). *Second*, the 1874 codification could not and did not repeal that text (Part D). *Third*, qualified immunity rests on a phantom statute: *Pierson* and its progeny construed only the codified version (Part E). *Fourth*, every textualist principle the Supreme Court has articulated demands fidelity to

enacted text over judicial gloss (Part F). *Fifth*, statutory *stare decisis* cannot rescue a doctrine that has never been an interpretation of any statute Congress enacted (Part G). *Sixth*, purposivism confirms the same result (Part H).

### C. The Enrolled Text of Section 1 of the Civil Rights Act of 1871 Contains the Notwithstanding Clause, Which Unambiguously Abrogates State-Law Immunities.

"The enrolled bill—the version signed by the Speaker of the House, the President of the Senate, and the President of the United States—is 'the legal evidence of the laws.'" *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672–73 (1892); *see also* 1 U.S.C. § 112 (Statutes at Large "shall be legal evidence of laws"); 1 U.S.C. § 204(a) (United States Code is only "prima facie" evidence). The enrolled text of Section 1 of the Civil Rights Act of 1871 reads in full:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . .

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (emphasis added). The italicized sixteen words—the Notwithstanding Clause—are the textual command that resolves this case.

"Notwithstanding" clauses have a precise and well-understood operation: they "supersede [] all other laws." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). When Congress writes that liability shall attach "any [state] law, statute, ordinance, regulation, custom, or usage . . . to the contrary notwithstanding," it has performed the legislative equivalent of clearing the table: no state-law rule, written or unwritten, may operate to defeat the federal cause of action. The terms "custom" and "usage," in 1871 legal parlance, were synonymous with "the common law." *See* Noah Webster, *An American Dictionary of the English Language* (1828) (defining "unwritten or common law" as a body of usages and customs); 1 William Blackstone, *Commentaries* *68 (general customs, or the common law properly so called, are founded upon immemorial universal usage); *Strother v. Lucas*, 37 U.S. (12 Pet.) 410, 436–37 (1838) ("Every country has a common law of usage and custom . . . .").

Read with these contemporaneous meanings, the Clause performs a categorical abrogation. It tells federal courts that a state's law—whether enacted by its legislature, promulgated as regulation, or developed by its courts as common-law immunity—is irrelevant to liability. It is "unsubtle and categorical." *Rogers*, 63 F.4th at 982 (Willett, J., concurring). And as Judge Willett observed, what "the 1871 Congress meant for state actors who violate Americans' federal

rights is not immunity, but liability—indeed, liability notwithstanding any state law to the contrary." *Id.* at 983.

**D. The 1874 Codification Did Not—and Could Not—Repeal the Notwithstanding Clause.**

In 1874, Congress directed the Reviser of Federal Statutes to consolidate the existing federal laws into a single, organized compilation. *See* Act of June 27, 1866, ch. 140, 14 Stat. 74; *see also* Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213, 218–19 (2020); Reinert, *supra*, at 236–37. The Reviser's authority was limited: he was to consolidate, not to legislate. When he reproduced Section 1 of the 1871 Act in the Revised Statutes, however, the Notwithstanding Clause disappeared. The reasons for the omission are unknown. What is known—and dispositive—is that the omission has no legal force.

Where a "change of arrangement" by a codifier is given no weight, *United States v. Welden*, 377 U.S. 95, 98 n.4 (1964), then *a fortiori* a substantive deletion of sixteen words — a change far beyond mere arrangement — must be given no weight either. The United States Code is at most "prima facie" evidence of the law, which must yield when it conflicts with the enrolled text. *Id.*, *United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993). *See also Stephan v. United States*, 319 U.S. 423, 426 (1943) ("the very meaning of 'prima facie' is that the Code cannot prevail over the Statutes at Large when the

two are inconsistent”); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957) (Revisers’ Notes do not express any substantive change); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 (1968); *United States v. Price*, 383 U.S. 787, 803 n.13 (1966). And the Supreme Court has acknowledged with respect to § 1983 itself that the Reviser's "changes of the arrangement of clauses . . . were not intended to alter the scope of the provision." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 510 (1939)

The principle these cases announce is constitutional in pedigree. Article I vests the legislative power in Congress, U.S. Const. art. I, § 1; statutes become law only after passage by both Houses and presentment to the President, *id.* art. I, § 7; *INS v. Chadha*, 462 U.S. 919, 951 (1983). A government clerk in 1874 had no constitutional authority to repeal sixteen words of an enacted civil-rights statute. The Notwithstanding Clause is therefore still the law. The text printed today in 42 U.S.C. § 1983 is, on this point, no more than “prima facie” evidence of what Congress enacted, and it is rebutted by the Statutes at Large. *U.S. Nat’l Bank*, 508 U.S. at 448.

> The Supreme Court itself has previously quoted the Notwithstanding Clause when describing the same statute. In *Hague v. Committee for Industrial Organization*, the Court reproduced § 1 of the 1871 Act in full—Notwithstanding Clause included—and confirmed that the Reviser's reorganization was 'not intended to alter the scope of the provision.' 307 U.S. at 510. The Court thus had the correct text in front of it in 1939. Twenty-eight years later, in *Pierson*, it did not.

**E. The Court Has Been Construing a Phantom Statute: *Pierson v. Ray* and Its Progeny Rest on a Premise That Was Never Factually True.**

The original sin of qualified-immunity doctrine is *Pierson v. Ray*, 386 U.S. 547 (1967). *Pierson* reasoned that, although § 1983 by its terms "makes liable 'every person'" who deprives another of constitutional rights under color of law, "[t]he legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities." *Id.* at 554. The Supreme Court then built an entire doctrinal edifice on that mistake, repeatedly extending qualified immunity on the premise that Congress had said nothing about common-law defenses. *See Wood v. Strickland*, 420 U.S. 308, 318 (1975); *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (substituting an objective "clearly established law" standard for subjective good faith); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (insisting that prior precedent must place the question "beyond debate").

Each of these decisions rests on *Pierson*'s assumption that the legislative record gave no indication Congress meant to abrogate common-law immunities. *See*, *e.g.*, *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983) (finding "no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions"); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) (similar premise as to prosecutorial immunity).

That premise was wrong as a matter of historical fact. The Civil Rights Act of 1871 contained the very textual signal *Pierson* declared absent. Section 1, as Congress enacted it, told courts that liability would attach to constitutional violations "*any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*." 17 Stat. 13. One looks in vain for stronger language abrogating state-law defenses—common-law immunities very much included. The footnote in *Pierson* that purported to quote the statute at issue, *see* 386 U.S. at 548 n.1, quoted only the truncated codified version. The Court was not interpreting the law Congress enacted. It was interpreting the artifact of an 1874 codification error.

Every subsequent case in the qualified-immunity line shares this defect. Although the Supreme Court has, on isolated occasions, accurately quoted the Notwithstanding Clause when discussing § 1983 in other contexts, *see, e.g.*, *Ngiraingas v. Sanchez*, 495 U.S. 182, 188 n.8 (1990); *Wilson v. Garcia*, 471 U.S. 261, 262 n.1 (1985); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 723 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978), it has never once interpreted the Clause in evaluating whether Congress meant to displace common-law immunities. *Rogers*, 63 F.4th at 983 n.11 (Willett, J., concurring). The doctrine's foundational empirical claim—that the 1871 Congress was silent on

immunities—was always demonstrably false on the face of the enrolled bill. The Court did not interpret the Clause; it interpreted a phantom statute.

### F. The Supreme Court's Own Textualist Methodology Compels Correction.

"Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020). Whatever else the Justices of the modern Supreme Court disagree about, they have spoken with a unanimous voice on the supremacy of enacted text. "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (Thomas, J.). Statutory text "should be 'interpreted as taking [its] ordinary . . . meaning . . . at the time Congress enacted the statute,'" not a meaning constructed later. *New Prime*, 139 S. Ct. at 539 (Gorsuch, J.) (citation omitted). And "courts have no warrant to ignore clear statutory language" merely because earlier decisions have done so. *Milner v. Dep't of Navy*, 562 U.S. 562, 576 (2011). That principle disposes of any argument that *Pierson*'s sixty-year reign over § 1983 immunizes its construction from textual correction.

Qualified immunity, as currently administered, is the antithesis of textualism. The doctrine takes a statute that says officers "shall … be liable" for deprivations of constitutional rights and rewrites it to say officers shall not be liable unless they violated rights that were "clearly established" in the precise

factual context confronting them. *Compare* 17 Stat. 13, *with Mullenix*, 577 U.S. at 12. Even disregarding the Notwithstanding Clause, that gloss has no textual hook anywhere in the statute. *See* William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 49–55 (2018) (showing that the doctrine cannot be derived from the statutory text). Restoring the Notwithstanding Clause to the text only sharpens the contradiction: the very state-law defenses qualified immunity recognizes are the defenses that Clause expressly forbids federal courts from honoring.

That is why Judge Willett of this Court was unsparing in his *Rogers* concurrence. The Notwithstanding Clause, he observed, “is unsubtle and categorical,” and qualified immunity “does more than complement the text; it brazenly contradicts it.” 63 F.4th at 982–83 (Willett, J., concurring). Judge Willett is not alone. Justice Thomas has repeatedly questioned whether qualified immunity “survive[s] under . . . a faithful reading of the statute.” *Ziglar v. Abbasi*, 582 U.S. 120, 158 (2017) (Thomas, J., concurring); *see also Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of certiorari) (urging the Court to reconsider qualified immunity); *Baxter v. Bracey*, 140 S. Ct. 1862, 1864–65 (2020) (Thomas, J., dissenting from denial of certiorari). A doctrine that “brazenly contradicts” the words on the page is not statutory interpretation. It is judicial legislation.

## G. Stare Decisis Does Not Protect a Doctrine Built on a Statute Congress Never Enacted.

Statutory *stare decisis* ordinarily counsels heavy hesitation before overruling. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455–56 (2015). The premise of that doctrine, however, is that the Court was actually interpreting the statute Congress enacted. Where it was not, statutory *stare decisis* offers no protection. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (statutory *stare decisis* does not protect a purely judge-made rule not grounded in anything Congress has enacted).

Under every modern framework the Supreme Court applies when deciding whether to overrule prior precedent, qualified immunity falters.

### *1. Nature and Quality of the Error.*

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 268–70 (2022), instructs courts to weigh the nature of the error, the quality of reasoning, the workability of the rule, and the reliance interests it has generated. *Pierson*'s error is foundational and factual: it stated, as the basis of the entire doctrine, that the legislative record contained "no clear indication" of Congress's intent to abrogate common-law immunities. 386 U.S. at 554. The Notwithstanding Clause is exactly that indication, and it sits in the body of the statute itself. The quality of *Pierson*'s reasoning cannot rise above the quality of the statutory text it purported to interpret—and that text was incomplete.

***2. Workability.***

Qualified immunity is profoundly unworkable. It has spawned three appeals per case (motion to dismiss, summary judgment, and after final judgment), threatening proceedings with "delay, adding costs and diminishing coherence." *Johnson v. Jones*, 515 U.S. 304, 314-17 (1995). [1] And it has spawned an irreconcilable internal contradiction between *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (general principles can give fair warning), and *Mullenix*, 577 U.S. at 12 (precedent must "squarely govern"). That very tension produced the ruling under review here: the district court distinguished each Fifth Circuit precedent Mr. Torres cited on factual gradations *Hope* holds irrelevant, ROA.293-298, and on reconsideration denied having demanded "materially similar" facts at all, ROA.332-334 — illustrating in a single record the unworkability of asking lower courts to apply *Hope* and *Mullenix* simultaneously. The doctrine's incoherence in operation is itself evidence that it has no firm textual mooring.

***3. Reliance.***

There can be no cognizable reliance interest in violating the constitutional rights of citizens. A police officer who beats a non-resisting suspect does not "rely" on qualified immunity in the way that a contracting party relies on a statute

[1] It is, as one judge put it, "one of the most morally and conceptually challenging tasks federal appellate court judges routinely face." Hon. Charles R. Wilson, *"Location, Location, Location": Recent Developments in the Qualified Immunity Defense*, 57 N.Y.U. Ann. Surv. Am. L. 445, 447 (2000); *see also* John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 Fla. L. Rev. 851, 852 (2010).

of limitations or a property owner relies on the Patent Act. *Cf. Kimble*, 576 U.S. at 457–58 (reliance based on patent contracts). The reliance interest commonly invoked—that officers will hesitate to perform their duties without immunity—is hypothetical at best and in any event is outweighed by the public's reliance on the constitutional remedies that the Reconstruction Congress provided.

***4. Demonstrably Erroneous.***

Justice Kavanaugh, writing in concurrence in *Ramos v. Louisiana*, 590 U.S. 83, 122 (2020) (Kavanaugh, J., concurring in part), explained that prior decisions may be “unmasked as egregiously wrong based on later legal or factual understandings.” Justice Thomas put the point still more directly: “If the Court encounters a decision that is demonstrably erroneous—i.e., one that is not a permissible interpretation of the text—the Court should correct the error, regardless of whether other factors support overruling.” *Gamble v. United States*, 587 U.S. 678, 717-18 (2019) (Thomas, J., concurring). Few decisions are more demonstrably erroneous than one that founded a constitutional-tort doctrine on the absence of statutory language that, in fact, is right there in the enrolled bill. Whether the operative test is *Dobbs*’s multifactor balancing, *Ramos*’s “egregiously wrong” criterion, *Gamble*’s “demonstrably erroneous” standard, or *Loper Bright*’s caution against protecting “purely judge-made rule[s],” 144 S. Ct. at 2273, the doctrine of qualified immunity fails. The *stare decisis* question is not

whether the Court should casually unsettle expectations, but whether the Court should continue to enforce a rule it manufactured by reading a statute that omitted the very words that resolved the case.

### H. Purposivism Confirms the Same Conclusion.

Even setting textualism aside, purposivism leads to the same destination. The legislative purpose of the Civil Rights Act of 1871 leads to the identical destination. Section 1983's "very purpose was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). The Reconstruction Congress confronted Southern states whose officers were systemically failing to enforce constitutional rights—and, worse, were themselves engaged in violence against newly freed African-Americans and Unionists. *See Monroe v. Pape*, 365 U.S. 167, 175–80 (1961) (canvassing the legislative history). The 1871 Act was designed to override state-law barriers, not to import them through judicial construction.

The legislative history confirms what the text already commands. 'Far from being silent about immunities,' Professor Matasar concluded after canvassing the floor debates, the 1871 record is 'replete' with statements that the Act would override common-law defenses. Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark. L. Rev. 741,

771 (1987). Congress understood the bill to impose liability without regard to a state officer's subjective good faith. Opponents complained that the statute was too broad precisely because it stripped officers of common-law defenses. *See* Reinert, *supra*, at 238–39; Matasar, *supra*, at 771. Their complaints would have been senseless if the statute, as written, preserved those defenses. Qualified immunity, in operation, achieves the very result that opponents of the bill failed to obtain on the floor of Congress: it restores, by judicial fiat, the state-law immunities that the Reconstruction Congress voted to abolish.

Whether the touchstone is text or purpose, the conclusion is the same. The 1871 Congress meant for state actors who deprive citizens of constitutional rights to be liable. It said so in writing. It said so notwithstanding any contrary state law. That is the law Congress passed. That is the law the President signed. That is the law that should govern Antonio Torres's claim.

## I. This Court Should Acknowledge the Foundational Error and Call for Supreme Court Correction.

Appellant recognizes the limits of this Court's authority. As a panel of an intermediate court of appeals, the Court cannot overrule *Pierson*, *Harlow*, *Anderson*, or *Mullenix*. Judge Willett candidly acknowledged that constraint in *Rogers*, explaining that "[a]s middle-management circuit judges," he and his colleagues could not override decades of Supreme Court qualified-immunity precedent. 63 F.4th at 983 (Willett, J., concurring). Only the Supreme Court "can

definitively grapple with § 1983's enacted text and decide whether it means what it says." *Id.*

But this Court can—and in the interest of intellectual honesty and the rule of law should—do four things. *First*, it should acknowledge that the enrolled text of § 1983 contains language, the Notwithstanding Clause, that has never been considered by the Supreme Court in evaluating qualified immunity. *Second*, it should recognize that this language is, in Judge Willett's phrase, "game-changing." 63 F.4th at 982. *Third*, it should make clear, on this record, that the doctrine's foundational premise—that Congress was silent about immunities—was factually wrong. *Fourth*, it should hold that the enrolled text means what it says — that the Notwithstanding Clause abrogates state-law immunities — and reverse on that ground. Statutory stare decisis poses no obstacle, because *Pierson* and its progeny construed the 1874 codification, not the enrolled Act, and even classical stare decisis admits an exception for precedents "flatly absurd or unjust." 1 William Blackstone, *Commentaries* *70.

**J. Conclusion**

The textual case for correction is not close. Section 1 of the Civil Rights Act of 1871, as enrolled and signed, contains an express Notwithstanding Clause that abrogates state-law immunities. The 1874 codifier had no power to repeal it, and did not. Every textualist canon the Supreme Court has articulated — fidelity

to enacted text, ordinary public meaning at enactment, the rule against judicially excising statutory language — points the same way, and statutory stare decisis cannot shield a doctrine that has never been an interpretation of any statute Congress passed. Purposivism reaches the identical destination. Appellant accordingly asks this Court to acknowledge what the enrolled text plainly says and to hold that the doctrine of qualified immunity, as currently constituted, cannot be squared with the statute Congress passed.

## II. THE DISTRICT COURT ERRED IN GRANTING QUALIFIED IMMUNITY BECAUSE TWO INDEPENDENT PATHWAYS GAVE OFFICER BYOUS FAIR WARNING THAT STRIKING A SURRENDERING, NON-RESISTING SUSPECT VIOLATES THE FOURTH AMENDMENT.

### A. Introduction.

Even setting Issue I aside, existing Supreme Court and Fifth Circuit precedent require reversal. The court below committed a single, recurring error. It demanded near-factual identity between Officer Byous's conduct and prior cases—distinguishing each on gradations of fact (whether the suspect first fled, the number of strikes, the duration of force, the severity of injury, the involvement of additional officers) that *Hope v. Pelzer*, 536 U.S. 730 (2002), expressly holds are irrelevant to fair-warning analysis. The court's order summarily dismissed every Fifth Circuit case Appellant cited—*Newman*, *Curran*, *Cooper*, *Joseph* , *Bagley*, and *Vardeman*—as factually distinguishable. ROA. 293-298 (Mem. Op.

& Order at 4-9). That conclusion rests on a *Mullenix*-only reading of the doctrine that *Hope* forbids.

Officer Byous had fair warning through two independent pathways:

***Pathway A—The Case-Law Pathway.***

A robust line of Fifth Circuit decisions—reinforced by a consensus among the Second, Sixth, Seventh, Tenth, and D.C. Circuits—has long established that an officer may not strike a suspect who has ceased resistance and is surrendering.

***Pathway B—The Plainly-Incompetent Pathway.***

Officer Byous violated the universal force continuum derived from *Graham v. Connor* and adopted by the Dallas Police Department, as his own department's defensive-tactics trainer concluded after a frame-by-frame review and as Internal Affairs sustained at every level through the Chief of Police.

Either pathway, standing alone, requires reversal.

**B. Standard of Review.**

"This Court reviews de novo the grant of summary judgment based on qualified immunity, viewing the facts in the light most favorable to the non-movant and drawing all reasonable inferences in his favor." *Hanks v. Rogers*, 853 F.3d 738, 743–44 (5th Cir. 2017); *see supra* Part I.A.

### C. The District Court Applied a Standard of Factual Specificity That *Hope v. Pelzer* Expressly Forbids.

Before turning to the two pathways, this Court must correct the framework applied below. The district court's August 15, 2025 Order distinguished each case Appellant cited on factual gradations, concluding the "facts are simply too different" in *Curran*, and that *Bartlett* and *Cooper* "involved more severe force—both in quantity and duration." ROA.295-298 (Mem. Op. at 6-9). On reconsideration, the court added that Appellant sought a "bright line rule defined at a high level of generality." ROA.334 (Mem. Op. & Order, Dec. 9, 2025, at 3) (citing *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 476 (5th Cir. 2019)). Both rulings inverted *Hope*'s teaching. The fact that *Taylor* and *McCoy* arose in prison-conditions settings does not limit their force here. *Hope* itself was an Eighth Amendment case, and the "fair warning" framework it announced — which the Supreme Court drew from *United States v. Lanier*, 520 U.S. 259, 270–71 (1997) — applies, in the Court's own words, as a "single warning standard" across constitutional contexts. *Hope*, 536 U.S. at 740. The Fifth Circuit's failure to apply *Hope* in *Taylor* and *McCoy* is therefore directly probative of how this Court should approach the same fair-warning analysis in Fourth Amendment force cases like this one.

In *Hope*, the Eleventh Circuit had held that prison officials were not on notice that handcuffing an inmate to a hitching post for seven hours violated the

Eighth Amendment because no prior case presented "materially similar" facts. 536 U.S. at 739. The Supreme Court reversed, repudiating the materially-similar standard:

> The Court of Appeals' rigid gloss on the qualified immunity standard . . . is not consistent with our cases. As we have explained, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." . . . [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar."

536 U.S. at 739 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001), and *United States v. Lanier*, 520 U.S. 259, 271 (1997)). The Court emphasized that "the salient question that the Court of Appeals ought to have asked is whether the state of the law" at the relevant time "gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.* "General statements of the law are not inherently incapable of giving fair and clear warning" and "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* at 740–41 (citation omitted).

The Supreme Court has reaffirmed *Hope* as binding authority. In *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam), the Court summarily reversed a Fifth Circuit qualified-immunity grant, holding that "any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution" and

citing *Hope* for the proposition that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* at 53–54. The same principle applies here: the brutality of striking a surrendering, hands-raised suspect with metal handcuffs is the kind of conduct any reasonable officer should have recognized as unconstitutional. The Court did the same in *McCoy v. Alamu*, 141 S. Ct. 1364 (2021), summarily vacating another Fifth Circuit qualified-immunity grant. *Hope* remains good law; the district court was required to apply it. Both summary reversals issued without merits briefing or argument. The Supreme Court did not regard *Hope* as a doctrinal relic; it regarded the Fifth Circuit's failure to apply it as too obvious to require full-dress consideration. Twice in fourteen months, the Supreme Court summarily reversed Fifth Circuit qualified-immunity grants for failing to apply *Hope.*

Yet the order below evaluated each Fifth Circuit case for a tight factual fit and granted immunity when the fit was imperfect. That is the very analysis *Hope* forbids. The district court's reconsideration order denied applying a "materially similar" test, ROA.334 (Dec. 9, 2025 Order at 3), but its mode of distinguishing each case—noting that *Bartlett* involved "dozens of blows," *Cooper* a "prolonged K-9 attack," *Curran* a different temporal sequence, and so on, ROA.295-298—was materially-similar analysis in everything but name. The implication of the

district court's approach would be that officers may deliver one unconstitutional blow to every surrendering suspect, then claim immunity on the ground that prior cases involved multiple strikes. *Hope* forecloses that result.

The proper inquiry, under *Hope*, is not whether prior cases involved exactly two head strikes with handcuffs against a fleeing-then-surrendering suspect. It is whether, in light of pre-existing law, “the unlawfulness” of striking a non-resisting, surrendering suspect was “apparent.” 536 U.S. at 739. As demonstrated below, both Fifth Circuit precedent and a robust consensus of persuasive authority confirm it was.

## D. Pathway A: Fifth Circuit Precedent and a Multi-Circuit Consensus Gave Officer Byous Fair Warning

### *1. Fifth Circuit precedent gave Officer Byous fair warning.*

Well before January 7, 2022, this Court had repeatedly held that an officer who uses force against a suspect who has ceased resisting violates the Fourth Amendment, regardless of the precise instrument of force or the precise sequence of resistance and surrender.

In *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), this Court denied qualified immunity to officers who tased and struck with a baton a suspect whose "behavior [did] not rise to the level of active resistance." *Id.* at 763–64. The Court emphasized that the officers "resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands" and responded

disproportionately to the threat. *Id.* at 763. That principle applies here on all fours: Officer Byous, by his own department's admission, gave "no verbal commands or direction" before delivering closed-fist strikes to Mr. Torres's head. ROA.224 (Doc. 40-3 at 2).

In *Curran v. Aleshire*, 800 F.3d 656 (5th Cir. 2015), this Court denied qualified immunity to an officer who slammed a teenage student's head into a wall after the student had stopped active resistance, even though she had previously "battered" the officer. *Id.* at 658, 663. The Court held that the temporal gap between resistance and the use of force created a fact question precluding qualified immunity. *Id.* If *Curran* denied immunity to an officer who used force on a suspect who had actually assaulted him but then stopped, *a fortiori* Officer Byous cannot claim immunity for striking Mr. Torres, who at most had fled and knocked over a trash can before raising his hands and turning toward a fence with no avenue of escape. *Cf. Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased").

In *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), this Court held that "permitting a dog to continue biting a compliant and non-threatening arrestee is

objectively unreasonable" and that the right against such force was clearly established. *Id.* at 524. As this Court later explained, "the officer encountered the suspect cornered" in a confined space with "the dog physically keeping him from going anywhere," leaving the suspect with "no meaningful way to evade police custody." *Joseph*, 981 F.3d at 340 (discussing *Cooper*). Mr. Torres was likewise immobilized: the chain-link fence cut off escape, Officer Byous was upon him, and the body-worn-camera footage shows Mr. Torres lowering himself toward the ground with hands raised — the functional equivalent of physical restraint. ROA.75-76 (First Am. Compl. ¶¶ 4.7–4.10).

In *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020) — the most recent pre-incident decision in this line — this Court synthesized the principle in unmistakable terms: "Officers engage in excessive force when they physically strike a suspect who is not resisting arrest." *Id.* at 342. The Court further held that "Force must be reduced once a suspect has been subdued. Notably, 'subdued' does not mean 'handcuffed.' If the suspect lacks any means of evading custody — for example, by being pinned to the ground by multiple police officers — force is not justified." *Id.* at 335. "Lawfulness of force . . . does not depend on the precise instrument used to apply it." *Id.* at 340. Whether the implement is a baton, a Taser, a fist, or a fist holding metal handcuffs is constitutionally beside the point.

Together with *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017), and *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) — both squarely on the books before January 2022 — these decisions establish that an officer may not strike a non-resisting suspect, and must use "measured and ascending actions" calibrated to the suspect's level of resistance. *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012); *see also Hanks*, 853 F.3d at 749. That rule was settled long before Officer Byous encountered Mr. Torres.

This Court's subsequent decisions confirm rather than create the rule. In *Bagley v. Guillen*, 90 F.4th 799 (5th Cir. 2024), the Court reaffirmed *Joseph*'s holding that "where a suspect initially resists, force 'must be reduced once [he] has been subdued.'" *Id.* at 805 (quoting *Joseph*, 981 F.3d at 335). That confirms the precise rule that governs this case: by Officer Byous's own department's frame-by-frame review, Mr. Torres "appeared to be going down to the ground" and "appeared to offer no resistance" at the moment of the strikes. ROA.224 (Doc. 40-3 at 2). Whatever flight or non-compliance preceded that moment, *Joseph* — decided in 2020 — required Officer Byous to reduce his force, not escalate it.

### *2. The district court's case-by-case distinctions are each individually wrong under Hope.*

The district court's order treats each Fifth Circuit case as unhelpful because of one or another factual gradation. None of those gradations is constitutionally meaningful under *Hope*.

*Whether the suspect initially fled.* The district court emphasized that Mr. Torres had fled before being cornered. But *Curran* denied immunity where the suspect had actually battered the officer—conduct far worse than flight. 800 F.3d at 658, 663. *Cooper* denied immunity where the suspect had attempted to evade by hiding in a confined space. 844 F.3d at 524. Indeed, this Court's recent precedents span the full resistance spectrum — *Vardeman* (no flight, no resistance), *Bagley* and *Newman* (no flight, passive non-compliance), and *Curran* (prior battery followed by cessation) — yet each reaches the same conclusion: once a suspect is no longer actively resisting, force directed at that suspect is excessive, regardless of how the encounter began. The fact that initial resistance occurred does not extinguish the constitutional right against force once resistance ends.

*The number of strikes.* The district court distinguished *Bartlett* because it involved "dozens" of blows. ROA.295. But if twenty strikes against a non-resisting suspect violate clearly established law, then so does one. The principle is the same; the magnitude of the violation is a damages question, not a clearly-

established-law question. The constitutional violation occurs at the moment unjustified force begins. Officers are not entitled to one free unconstitutional strike. As the Seventh Circuit put it, "police officers cannot continue to use force once a suspect is subdued." *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013); *see also id.* at 733 (officers "could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders").

*The duration of force.* Officer Byous emphasized below that his strikes occurred in approximately one second. ROA.287 (Reply in Supp. of MSJ at 9). That argument cuts the wrong way. When flight ends and surrender begins, force must end. *See Mason*, 806 F.3d at 277. The constitutional principle does not turn on the officer’s reaction time; it turns on whether resistance has ceased. Sergeant Greer’s frame-by-frame analysis confirms that, in the moment immediately preceding the strikes, Mr. Torres was “going down to the ground” and “appeared to offer no resistance.” ROA.224 (Doc. 40-3 at 2). One second is enough.

*The severity of injury.* Mr. Torres required staples and stitches at Baylor University Medical Center, has experienced “concussion-driven headaches, occipital neuralgia, mild cognitive impairment, and insomnia,” and continues neurofeedback and nerve-block therapy. ROA.78 (First Am. Compl. ¶ 4.21). But severity of injury is a damages question, not a clearly-established-law question.

*See Joseph*, 981 F.3d at 342. Whether an officer strikes once or twenty times, whether with a fist or a baton, whether causing bruises or broken bones—these are damages questions for the jury, not threshold questions for qualified immunity.

*The involvement of additional officers.* Some Fifth Circuit cases involved multiple officers and others a lone officer. The constitutional principle in *Joseph*, *Cooper*, and *Newman* turns on resistance and surrender, not officer headcount. *See Joseph*, 981 F.3d at 335 ("subdued does not mean handcuffed").

None of these factual variations obscures the governing principle. Any reasonable officer watching Mr. Torres lower himself with hands raised would have understood that striking him in the head violated clearly established law. A requirement of near-identical facts would grant officers one free constitutional violation for every novel fact pattern. *Hope* does not allow that result.

***3. A robust consensus of circuits independently establishes the right.***

Even if Fifth Circuit precedent alone were not sufficient — and it is — "a robust consensus of cases of persuasive authority" can independently establish the law. *Morrow v. Meachum*, 917 F.3d 870, 879 (5th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Such a consensus exists here.

The cases vary in their particulars — different instruments, different sequences, different injuries. That variation is the point. Under *Hope v. Pelzer*, factual variation across cases is what *establishes* a "general constitutional rule"

capable of applying "with obvious clarity to the specific conduct in question." 536 U.S. 730, 741 (2002).

The principle is consistent across circuits. The Second Circuit has held that force "reasonable against a suspect who is fleeing . . . may be objectively unreasonable . . . when he has been stopped and no longer poses a risk of flight." *Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017). And in *Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020), the Second Circuit reversed a grant of qualified immunity to an officer who tased a suspect a second time, holding that "even though [the suspect] may have been resisting arrest during the initial parts of the police encounter up to the time of the first tasing," qualified immunity did not apply at the moment of the second use of force, when the suspect "was no longer trying to get off the ground, no longer actively resisting arrest, and no longer posing a threat to the police officers." *Id.* at 230. The Sixth Circuit has held that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law" — irrespective of formal handcuffing. *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). And the Seventh Circuit has held that officers may not "beat into submission a person who was not resisting or was merely passively resisting officers' orders." *Abbott v. Sangamon County*, 705 F.3d 706, 733 (7th Cir. 2013); *see also Becker v. Elfreich*, 821 F.3d 920, 928–29 (7th Cir. 2016) (force on suspect once he had surrendered is unreasonable).

These cases govern Mr. Torres's circumstances directly. The constitutional inquiry turns on the moment force is applied, not on what preceded it. *Jones*, 963 F.3d at 236 ("the reasonableness of the amount of force used is assessed 'at the moment' the force is used"). When Officer Byous delivered the strikes, Mr. Torres — by the Department's own frame-by-frame analysis — "appeared to be going down to the ground" and "appeared to offer no resistance." That is the *Jones*/*Soto* fact pattern. Together with the Fifth Circuit authorities, these decisions place "beyond debate" the proposition that an officer may not strike a suspect whose flight has ended and who is in the process of surrendering. *al-Kidd*, 563 U.S. at 741.

## E. Pathway B: Officer Byous Violated the Constitutional Force Continuum on Which He Was Trained, as His Own Department's Trainer Confirmed.

### *1. Hope recognizes non-judicial sources of fair warning.*

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Ashcroft*, 563 U.S. at 743. The doctrine therefore yields when an officer's conduct is so manifestly contrary to professional standards that no "officer of reasonable competence," *Malley*, 475 U.S. at 341, could think the conduct lawful.

Crucially, *Hope v. Pelzer* holds that officers can be on "fair notice" that their conduct is unconstitutional through sources other than judicial precedent. 536 U.S. at 741–44. In *Hope* itself, the Supreme Court held that an Alabama Department of

Corrections regulation, combined with a Department of Justice report, together with judicial precedent, "put a reasonable officer on notice that the use of the hitching post under the circumstances alleged by Hope was unlawful." *Id.* at 744–46 (cleaned up). *Hope* thus recognizes that department regulations, training materials, and official guidance can combine with judicial precedent to put officers on fair notice — and indeed can be the decisive component when, as here, judicial precedent already establishes the governing principle. 536 U.S. at 744–46

***2. The Linear Response Continuum is the constitutional force matrix—derived directly from Graham v. Connor and adopted nationwide.***

Virtually every law-enforcement agency in the United States trains officers using a "force continuum" model that translates *Graham v. Connor*'s objective-reasonableness factors into operational guidance. The International Association of Chiefs of Police's *National Consensus Policy on Use of Force* (rev. 2020), endorsed by every major federal law-enforcement organization, articulates the same matrix that the Dallas Police Department has adopted as its Linear Response Continuum. ROA.200 (Doc. 40 at 12); Dallas Police Dep't, *Response to Resistance Report* 3 (2018). The continuum is not a department-specific preference. It is the universal operational translation of the Fourth Amendment's reasonableness command into the curricula of every American police academy.

Under that continuum, the level of resistance the suspect is presenting determines the level of force the officer may permissibly use:

- Officer Presence / Verbal Direction — for cooperative subjects;
- Soft Empty-Hand Control (joint locks, pressure points, handcuffing) — for *passive* resistance;
- Hard Empty-Hand Control, OC spray, ECW (Taser), pepperball area saturation — for *defensive* resistance;
- Intermediate weapons, impact weapons, baton, pepperball direct contact — for *active* aggression;
- Deadly Force — for *aggravated* aggression.

ROA.200 (Doc. 40 at 12). For *passive* resistance, the continuum permits *only* "soft empty-hand control." Closed-fist strikes to the head are categorically prohibited. They are reserved—if at all—for *active* aggression, two full categories above passive resistance.

### ***3. Officer Byous's own department's defensive-tactics expert concluded he violated the continuum.***

The officer responsible for training Dallas Police Department officers on the very force continuum at issue— Sergeant Anthony Greer, Sergeant of DPD's Defensive Tactics, PT, and Less Lethal program—reviewed the body-worn camera footage frame-by-frame at Internal Affairs' direction. His sworn conclusion, in his own words::

> Although the subject did initially exhibit Defensive Resistance when he pulled away, ran from Officer Byous, and pulled over a trash can to obstruct Officer Byous, the subject's flight and Defensive Resistance stopped once he found himself unable to flee any further due to a fence . . . . [T]he Defensive Resistance level was not a continuation because the subject was no longer fleeing, and he appeared to be going down to the ground just prior to Officer Byous delivering the strikes . . . . [A]t the time the strikes were delivered no verbal commands or direction were given and the subject appeared to offer no resistance . . . . [T]he closed strikes to the head utilized by [O]fficer Byous were not reasonable and did not fall within Departmental policy.

ROA.224-225 (Doc. 40-3 at 2-3) (emphasis added).

Sergeant Greer's conclusion was not the only one. The Dallas Police Department's Internal Affairs Division opened Investigation No. CN2022-054 and "sustained" the allegation that Officer Byous engaged in "Inappropriate or Unnecessary Use of Force" in violation of DPD Code of Conduct § 4.10 and General Order 703.02(A)(4). ROA.247 (Doc. 40-7). The finding was reviewed and sustained at every level—by Officer Byous's immediate supervisor, the Internal Affairs Division, the Public Integrity Unit, the Patrol Bureau, and ultimately the Chief of Police, Eddie Garcia. ROA.221-222 (Doc. 40-2 at 4-5); ROA.250-254 (Doc. 40-9). Assistant Chief of Police Michael T. Igo issued a formal disciplinary letter, and Officer Byous served a ten-day unpaid suspension. ROA.251-254 (Doc. 40-9 at 2-5). At every level of administrative review, Officer

Byous's closed-fist strikes to Mr. Torres's head were determined to be excessive and to fall outside both departmental policy and reasonable professional standards.

### *4. Hope's framework is satisfied here.*

The parallel to *Hope* is exact. In *Hope*, the Alabama prison regulation prohibited the conduct at issue, and a DOJ report had identified the conduct as unconstitutional; together with judicial precedent, those sources put officers on "fair warning." 536 U.S. at 741–46. Here:

(a) The Dallas Police Department's Linear Response Continuum—derived directly from *Graham v. Connor* and Fifth Circuit excessive-force jurisprudence—expressly prohibited Officer Byous's conduct;

(b) The Department's Internal Affairs Division—after a formal investigation reviewed at every level through the Chief of Police—concluded that Officer Byous violated those standards by striking Mr. Torres "when Mr. Torres was no longer displaying resistance," ROA.253 (Doc. 40-9 at 4); and

(c) The constitutional principle that officers may not strike non-resisting suspects has been articulated in multiple Fifth Circuit decisions and a robust multi-circuit consensus, *see supra* Part D.

Like the regulations and DOJ report in *Hope*, the constitutional force continuum on which Officer Byous was trained provided him notice that closed-fist strikes to

the head of a passively-resisting, surrendering suspect violated the Fourth Amendment. While the policy violation alone does not establish constitutional liability, *see Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009); *Hanks v. Rogers*, 853 F.3d 738, 749 n.10 (5th Cir. 2017), the convergence of departmental training, departmental adjudication, and judicial precedent forecloses any claim of reasonable mistake. The convergence of nationwide training, departmental adjudication, and judicial precedent forecloses any claim of reasonable mistake — Officer Byous was not reasonably mistaken, and he was not entitled to be.

#### ***5. Officer Byous's conduct meets Malley's 'plainly incompetent' standard***

Qualified immunity exists to give officers "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft*, 563 U.S. at 743. It does not exist to insulate officers who violate well-established professional and constitutional standards in front of a body-worn camera, and whose own departments adjudicate the conduct as outside policy. Under *Malley*, "the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." 475 U.S. at 341. Or, as the Court has reformulated it, the doctrine offers "breathing room to make reasonable but mistaken judgments about open legal questions" — but no shelter for those who, like Officer Byous, are not making any judgment call at all. *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 743 (2011). Officer Byous's conduct—for which his own department, after reviewing the same body-cam footage that the district court reviewed, sustained a "Sustained" finding of "Inappropriate or Unnecessary Use of Force" and imposed a ten-day unpaid suspension—falls into the latter category, not the former.

Officer Byous's own contemporaneous statements remove any doubt. On the bodycam, Officer Byous told fellow officers, "I laid into him cause I'm injured," ROA.76 (First Am. Compl. ¶ 4.12); chuckled to the EMT, "Oh, I got a hold of him," *id.*; threatened Mr. Torres that he would "bury" him and "make sure [he] never get[s] out of jail," *id.*; and characterized his use of force as retaliation for Mr. Torres's flight. *id.* ¶¶ 4.11–4.13. These admissions place this conduct outside the protective scope of qualified immunity. *See Newman*, 703 F.3d at 763 (force "disproportionate" where officers acted without commands or attempts at lesser force); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (officers must use "measured and ascending" actions corresponding to suspect's resistance); *Bagley*, 90 F.4th at 805 (force prohibited "after [the] person has begun to comply").

**F. Conclusion.**

Either of two independent pathways requires reversal of the district court's grant of qualified immunity. Pathway A shows that controlling Fifth Circuit

precedent gave Officer Byous fair warning under *Hope*. Pathway B shows that he violated the constitutional force continuum on which he was trained — as his own department's trainer concluded after frame-by-frame review and as Internal Affairs sustained at every level through the Chief of Police. This Court should reverse the grant of summary judgment and remand for trial.

## CONCLUSION

Appellant respectfully asks this Court to hold that qualified immunity cannot be reconciled with 42 U.S.C. § 1983 as Congress enacted it — that the enrolled Notwithstanding Clause of § 1 of the Civil Rights Act of 1871 abrogates the very state-law immunities the doctrine has reimposed — and to reverse the judgment below and remand for further proceedings. Statutory stare decisis poses no obstacle: *Pierson* and its progeny construed the 1874 codification, not the enrolled Act, and a court cannot owe deference to its own prior reading of a statute Congress never passed. And even where statutory stare decisis would otherwise apply, Blackstone's long-recognized exception for precedents "flatly absurd or unjust," 1 William Blackstone, *Commentaries* *70, governs a doctrine erected on the absence of statutory text that is in fact present in the enrolled bill.

Alternatively, and on independent grounds, this Court should reverse the district court's grant of summary judgment on qualified-immunity grounds and remand for trial. Under *Hope v. Pelzer* and this Court's controlling excessive-force

precedent, Officer Byous had fair warning that closed-fist strikes to the head of a surrendering, non-resisting suspect violate the Fourth Amendment, and his conduct in any event satisfies *Malley*'s "plainly incompetent" standard.

SUBMITTED BY:

/S/Damon E. Mathias
Damon Mathias
State Bar No. 24080170
Ori Raphael
State Bar No. 24088273
Mathias Raphael, P.L.L.C.
13101 Preston Road, Suite 501
Dallas, TX 75240
Office: 214-739-0100
Facsimile: 214-739-0151
Damon@mr.law
Ori@mr.law

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the foregoing Brief of Appellant with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system. I further certify that all counsel of record in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

S/Damon E. Mathias
DAMON MATHIAS

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 12,123 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14pt.

/S/Damon Mathias
DAMON MATHIAS